## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| **JACQUELYEN D.,**[1] | ) | |
| | ) | **No. 20 CV 2951** |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Magistrate Judge Young B. Kim** |
| | ) | |
| **KILOLO KIJAKAZI, Commissioner** | ) | |
| **of Social Security,** | ) | |
| | ) | **February 9, 2023** |
| **Defendant.** | ) | |

### MEMORANDUM OPINION and ORDER

Jacquelyen D. brings this action pursuant to 42 U.S.C. § 405(g) for judicial review of the final decision of the Commissioner of Social Security denying her disability insurance benefits ("DIB") after the Seventh Circuit Court of Appeals remanded the matter for further proceedings. Before the court are the parties' cross motions for summary judgment. For the following reasons, Jacquelyen's motion is denied and the government's is granted:

### Procedural History

Jacquelyen, a Navy veteran, applied for DIB in May 2013 alleging disability beginning on September 30, 2010, because of migraines, depression, PTSD, sexual trauma, anxiety, insomnia, and various physical conditions not relevant here. (Administrative Record ("A.R.") 125, 206.) After her application was denied, Jacquelyen sought and received a hearing before an administrative law judge ("ALJ").

---

[1] Pursuant to Internal Operating Procedure 22, the court uses the first name and last initial of Plaintiff in this opinion to protect her privacy to the extent possible.

(Id. at 121-31, 165-66, 134-48.) Jacquelyen and a vocational expert ("VE") testified at the hearing, (id. at 54-120), and the ALJ thereafter found that Jacquelyen was not disabled, (id. at 26-46). The Appeals Council denied review, so Jacquelyen filed a lawsuit (the "First Lawsuit") in this district seeking judicial review. (Id. at 1-12); *Jacquelyen D. v. Saul*, No. 16 CV 11434 (N.D. Ill.) (Cox, J.). The district court affirmed the Commissioner's decision, but the Seventh Circuit reversed and remanded the matter back to the Commissioner, faulting the ALJ for, among other things, "neglecting to address substantial evidence contrary to her conclusion" and "inadequate explanations for rejecting" the VA's disability rating and the opinions of Dr. Laura Sunn, a VA psychiatrist. *Jacquelyen D. v. Berryhill*, 756 Fed. Appx. 619, 626 (7th Cir. 2019). On remand, the ALJ engaged two medical experts ("MEs") and held two more hearings before reassessing Jacquelyen's residual functional capacity ("RFC") and again denying her application. (A.R. 2996-3029, 2954-95, 2913-43.) Jacquelyen now seeks judicial review a second time, and the parties consented to this court's jurisdiction. *See* 28 U.S.C. § 636(c); (R. 7).

## Background

Jacquelyen is a 23-year Navy veteran who was honorably discharged from her position as a dental technician and hospital foreman in September 2010 because of various medical conditions, including mental health issues that arose after her supervisor sexually harassed her. (A.R. 62-63.) She earned a master's degree in human resources before the relevant period and was 46 years old on December 31, 2015, her date last insured. (Id. at 62, 82.) Before filing her DIB application,

Jacquelyen applied for VA disability benefits and was found to be 90% disabled—half of which was attributable to migraine headaches and the other half to major depressive disorder. (Id. at 936.) Jacquelyen's VA disability records reflect her treatment with various VA professionals and are part of the evidence on which she relies in support of her appeal here.[2]

## A.    Initial Hearing

Jacquelyen testified that she was hospitalized for several days in 2009 for depression, for which she continues to be treated. (A.R. 63-64.) She explained that since joining the Navy, she also has suffered anxiety attacks that last about a day and a half and render her unable to complete tasks. In addition, Jacquelyen was diagnosed with obsessive-compulsive disorder and PTSD because of the sexual trauma she suffered. (Id. at 64-66.) She takes medication to manage her conditions. (Id. at 65.)

Jacquelyen said she also experiences memory issues and "really bad" migraines that have worsened through the years and are debilitating, causing nausea, diarrhea, and fainting "most days of the month." (Id. at 66-68, 74-75.) While Jacquelyen receives quarterly Botox injections to manage the migraines, the relief lasts for only a week or two, so she lies in bed with the lights out and takes other medication as needed. (Id. at 67, 71-72, 92.)

---

[2] The Seventh Circuit's 2019 opinion in this case discusses Jacquelyen's VA disability records and medical history in greater detail. *See generally Jacquelyen D. v. Berryhill*, 756 Fed. Appx. 619, 626 (7th Cir. 2019).

On a typical day, Jacquelyen stated that she stays in bed, cries for a "few hours," and sleeps. (Id. at 72-73.) She lives alone, drives short distances, and can prepare simple meals, although sometimes she gets her meals from a church. At times, Jacquelyen also goes grocery shopping and elsewhere but has trouble "dealing with" and trusting people and does not like strangers or crowds. (Id. at 69-70, 72-73.) She began a second master's degree program during the relevant period but switched to an associate's degree program for students with disabilities because she "couldn't handle the course work." (Id. at 82-83.)

Jacquelyen explained that her siblings sometimes drive her to Florida for extended visits with her family (e.g., four months in 2014 and five months in 2015), but that she also went once when her mother was sick and "needed somebody." (Id. at 79-81.) Jacquelyen did not establish medical care when in Florida because she did not want to "start over and find someone." (Id. at 80-81.) When asked why she missed various medical appointments, Jacquelyen reported that 90 to 95 percent of the time it was because she was too sick to make them. (Id. at 71, 82.) And when questioned about an April 2015 notation that she had been in Florida for three and a half months, that she had a great visit, and that she was happy biking, walking, and spending time with family, Jacquelyen said she had not biked in years or otherwise "been able to do any of those things." (Id. at 87.) Instead, she explained that she "pretty much stay[ed]" at her mother's house, "lay[ing] around" while her mother made sure she did not "hurt [her]self." (Id. at 91, 95.)

4

Regarding physical capabilities, Jacquelyen stated that she could stand for five minutes and walk for about 15 feet but could not "carry anything heavy because of [her] thumbs." (Id. at 94.) She also said that she could sit for 10 minutes to an hour at a time, depending on whether her hemorrhoids were flaring. (Id. at 93-94, 97.)

The ALJ described a hypothetical individual of Jacquelyen's age, education, and work history with an RFC in the light range and various additional physical and environmental restrictions who could learn, understand, and carry out simple, routine, and repetitive tasks on a sustained basis but had no required public interaction, teamwork, or tandem tasks, and only occasional, brief, and superficial interactions with coworkers. (Id. at 99-100.) The VE identified several suitable unskilled jobs. (Id. at 100.) The ALJ then reduced the exertional range from light to sedentary. The VE again listed several suitable unskilled jobs, (id.), but said there would be no competitive, unskilled work for an individual who could not leave the house, was absent at least twice a month or off-task 15 percent of the time or took an extra 20-minute break to lie down, (id. at 101-02).

## B. The First Lawsuit

The court concluded that the ALJ appropriately considered and discounted the VA's 90% disability rating and that the opinion analysis was not patently wrong when she deemed Jacquelyen less than fully credible. (A.R. 3096-3108.) The court noted with approval the ALJ's assessment that there was "not sufficient objective support" for the consistency, frequency, or symptom level Jacquelyen alleged, and that her reports were thus "grossly disproportional to the objective medical evidence,"

5

"undermin[ing] her general credibility." (Id. at 3101.) Like the ALJ, the court highlighted Jacquelyen's testimony that she had been too sick to attend certain appointments but her providers reported that she had visited or cared for family. (Id.) The court also found that substantial evidence supported the ALJ's RFC assessment, noting that the ALJ "considered the relevant factors" and supplied "good reasons" for discounting Dr. Sunn's August 2011 opinion that Jacquelyen was "so[] impaired that she cannot seek work and it is unlikely that she could concentrate long enough to complete tasks." (Id. at 3102-06.)

On appeal, however, the Seventh Circuit reversed and remanded the matter, observing that while the ALJ discounted Dr. Sunn's opinion as a "snapshot" of Jacquelyen's functioning, Dr. Sunn had treated Jacquelyen from March 2011 until November 2012, and consistently noted that her "mental status exam was unchanged or worse." *Jacquelyen D.*, 756 Fed. Appx. at 624. The Seventh Circuit also faulted the ALJ for failing to explain why she gave more weight to the opinions of consultative examiners who interacted with Jacquelyen only once by video. *Id.* In addition, the Seventh Circuit found that the ALJ improperly disregarded psychiatrist Dr. Patricia Zaror's opinion that Jacquelyen suffered from "paralyzing" migraines because neurologist Dr. Hieran Dang's treatment records "did not support this characterization," without mentioning that Dr. Dang twice brought Jacquelyen to the emergency room. *Id.* The Seventh Circuit also faulted the ALJ for not identifying the "normal" findings she concluded were inconsistent with the VA's disability rating, concluding that the VA's finding that Jacquelyen's impairments excluded her from

substantial gainful employment is "practically indistinguishable" from the Commissioner's disability determination. *Id.*

In finding the ALJ's mental RFC assessment lacking, the Seventh Circuit underscored that Jacquelyen "told numerous providers . . . that she stays in bed most of the day" and noted that this and other evidence not referenced by the ALJ could support greater mental restrictions. *Id.* at 625. Finally, the Seventh Circuit noted that in discounting Jacquelyen's allegations because she "tried to minimize that she went to college," the ALJ failed to take into account the fact that Jacquelyen was ultimately unable to finish her master's program even with accommodations. *Id.*

## C. Post-Remand Hearings

After the Seventh Circuit issued its remand order, Jacquelyen testified at her subsequent administrative hearing that her migraines had grown worse and did not respond to treatment. (A.R. 3000, 3006.) Jacquelyen said that she had been living in Florida for two to three months before the hearing and spent six months in Florida after the initial hearing. But she denied that she was helping her mother despite the ALJ's references to notations in the record to that effect. Jacquelyen said instead that her family was helping her and that her 80-year-old mother, who works full time, did not need any care. (Id. at 3001-02.)

At this hearing Jacquelyen again explained that she was unable to complete the master's program she entered in 2012. (Id. at 3003.) And she repeated that if she missed a medical appointment, it was because she was too sick, and that her activities through 2015 were limited to lying in bed, eating, and showering, despite

7

record notations suggesting she walked, biked, and spent time with family in Florida, (id. at 3004-06).

The ALJ presented the same hypothetical individual to the VE as she had done during the initial hearing but added that the individual also could "adequately sustain any necessary concentration, persistence, or pace ["CPP"] in two-hour increments throughout the typical workday." (Id. at 3022.) The VE identified several suitable unskilled jobs that were available in the same numbers. (Id. at 3022-23.) The VE testified that an individual could be off-task up to 10 percent of the day and absent less than once a month, or seven to ten days a year, but that breaks outside of two typical 15-minute breaks and a 30-minute lunch would not be tolerated on a chronic basis and no relevant work could be performed remotely from home. (Id. at 3022-24.)

Two MEs testified at the supplemental hearing. (Id. at 2956.) Testifying first was Dr. Steven Goldstein, board-certified in internal medicine and neurology, who opined that Jacquelyen could sit, stand, and walk for six hours and lift or carry 10 pounds frequently and 20 pounds occasionally despite her migraines. (Id. at 2961, 2966, 3809, 3828.) He stated that while a migraine might affect concentration, unless it was "complicated"—such as by causing hemiplegia[3]—it would not impact the ability to walk, and he saw nothing indicating Jacquelyen's migraines were

---

[3] Hemiplegia is a condition caused by brain or spinal injury that leads to paralysis on one side of the body, including weakness, muscle control problems, and stiffness. *See* www.healthline.com/health/hemiplegia (last visited Feb. 2, 2023).

complicated. (Id. at 2962.) Dr. Goldstein also saw no record of examination noting that a migraine caused Jacquelyen to pass out as she reported, and that her mental status examinations ("MSEs") did not corroborate the severity of symptoms she alleged. (Id. at 2968-71, 2973.)

Testifying next was clinical psychologist Dr. Michael Carney, who opined that Jacquelyen was mildly limited in understanding, remembering, or applying information and adapting or managing herself, and at most moderately limited in interacting with others. (Id. at 3823.) On the last point, Dr. Carney noted that Jacquelyen had joined a health club in April 2014 and traveled to Florida to support her mother, although he also acknowledged that he did not know how much Jacquelyen exercised or that her providers had suggested she go to Florida. (Id. at 2981-82, 3823.) Dr. Carney also found that Jacquelyen was at most moderately limited in CPP, citing her generally normal MSEs and moderate Global Assessment of Functioning ("GAF") scores.[4] (Id. at 2984-85, 3823.) He then acknowledged that he saw neither the lower GAF scores nor the Montreal Cognitive Assessment ("MCA") test reflecting a 2 out of 5 on delayed recall, and 0 out of 3 on series sevens, (id. at 2985). Nonetheless, Dr. Carney maintained his opinion, reasoning that Jacquelyen's overall MCA score was "decent" and that the other memory problems noted were

---

[4] GAF is no longer recognized in the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders ("DSM"), but it was previously used in disability proceedings. *See Brinley v. Berryhill*, 732 Fed. Appx. 461, 463 (7th Cir. 2018). "GAF scores of 51-60 indicate moderate symptoms or limitations in social, occupational, or school function." *Felts v. Saul*, 797 Fed. Appx. 266, 269 n.1 (7th Cir. 2019).

based on subjective reports, (id. at 2987-88). Dr. Carney also considered Jacquelyen's "highly irregular" sleeping patterns—including that she sometimes slept during the day—and opined that a lack of sleep can affect concentration. (Id. at 2989, 2992.) But because Jacquelyen had traveled—including to Florida, California, and for a wake—sometimes cared for her son, and otherwise did "a lot of things," Dr. Carney found she was not "completely debilitated." (Id.)

## D.    The Second ALJ Decision

The ALJ engaged in the standard five-step evaluation process, 20 C.F.R. § 404.1520(a),[5] finding at steps one and two that Jacquelyen had not engaged in substantial gainful activity during the relevant period and that she suffers from migraines, severe anxiety disorder, PTSD, major depressive disorder, obesity, and De Quervain tenosynovitis. (A.R. 2916.) At step three, the ALJ found that Jacquelyen's impairments were not of listings-level severity but concluded as Dr. Carney did that she was mildly limited in understanding, remembering, or applying information and adapting or managing herself, and moderately limited in CPP and interacting with others. (Id. at 2917-21.)

The ALJ then determined that Jacquelyen retained the RFC to perform light work but could: never climb ladders, ropes, or scaffolds; frequently climb stairs and ramps; reach in all directions, push/pull bilaterally, use hands for gross and fine

---

[5] Amendments to the Social Security regulations regarding the evaluation of medical evidence were published on January 18, 2017. 92 FR 5844-84 (Jan. 18, 2017). But because these amendments apply only to claims filed on or after March 27, 2017, references to the regulations in this opinion refer to the prior version.

manipulation, and operate foot controls; and occasionally balance, stoop, kneel, crouch, and crawl. (Id. at 2922.) She could work in a moderate or low noise-level environment that avoided unprotected heights, moving dangerous machinery, extreme temperatures, and pulmonary irritants, but involved frequent driving, humidity, and vibrations. (Id.) A person with Jacquelyen's RFC also could: "learn, understand, remember, and carry out [] simple work instructions, and work in a routine work environment"; tolerate occasional, brief interactions with co-workers; and sustain the requisite CPP in two-hour increments. (Id.) However, she could not engage in team or tandem work or work with the public. (Id.)

In assessing the RFC, the ALJ found that Jacquelyen's "statements concerning the intensity, persistence and limiting effects of [her alleged] symptoms" were "not entirely consistent with the medical evidence and other evidence in the record," (id. at 2925), and afforded only "partial" weight to Dr. Sunn's opinion because she did not perform diagnostic testing or document marked deficits on Jacquelyen's MSEs,[6] (id. at 2938). At the same time, the ALJ gave "great weight" to the opinions of the MEs, because: (1) "they meticulously reviewed all of the evidence"; (2) they "maintain a current understanding of Social Security Disability programs and evidentiary requirements"; and (3) "the objective findings and the diagnostic testing . . . support their opinions." (Id. at 2937.) The ALJ concluded at steps four and five that while Jacquelyen could not perform her past work, she was not disabled. (Id. at 2941-43.)

---

[6] The ALJ also assigned "little" weight to state agency medical and psychological consultants who opined in 2013-14 that Jacquelyen had no severe physical impairments and opined later that she was capable of medium work. (A.R. 2937.)

## Analysis

Jacquelyen argues that the ALJ repeated many of the same errors the Seventh Circuit identified in the First Lawsuit by improperly: (1) weighing opinion evidence; (2) rejecting her subjective symptom allegations; and (3) assessing her mental RFC. (R. 16, Pl.'s Mem.; R. 21, Pl.'s Reply.) When reviewing the ALJ's decision, the court asks only whether the ALJ applied the correct legal standards and her decision has the support of substantial evidence, *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019), which is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quotation and citations omitted). This deferential standard precludes the court from reweighing the evidence or substituting its judgment for the ALJ's, allowing reversal "only if the record compels" it. *Deborah M. v. Saul*, 994 F.3d 785, 788 (7th Cir. 2021) (quotation and citation omitted).

In this circuit the ALJ must also "provide a 'logical bridge' between the evidence and his conclusions," *Butler v. Kijakazi*, 4 F.4th 498, 501 (7th Cir. 2021). Put another way, the ALJ's "analysis must say enough to enable a review of whether the ALJ considered the totality of a claimant's limitations." *Lothridge v. Saul*, 984 F.3d 1227, 1233 (7th Cir. 2021); *see also Wright v. Kijakazi*, No. 20-2715, 2021 WL 3832347, at *5 (7th Cir. Aug. 27, 2021) ("[W]e will not 'nitpick[]' the ALJ's decision, but rather give the opinion a 'commonsensical reading,' focusing on whether the ALJ built a 'logical bridge from the evidence to his conclusion.'" (citation omitted)). Having

considered Jacquelyen's arguments and the record, the court concludes that the record does not compel reversal here.

## A.    Opinion Evidence

At the outset, Jacquelyen contends that it was improper for the ALJ to have discounted the opinions of her treating physicians while giving great weight to the MEs who reviewed her records without examining her.  (R. 16, Pl.'s Mem. at 11-15.) A treating physician's opinion in cases filed before March 27, 2017, is generally entitled to "controlling weight" if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence."  *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008) (quotation and citation omitted).  That said, the Seventh Circuit "uphold[s] all but the most patently erroneous reasons" for discounting such an opinion.  *Stepp v. Colvin*, 795 F.3d 711, 718 (7th Cir. 2015) (quoting *Luster v. Astrue*, 358 Fed. Appx. 738, 740 (7th Cir. 2010)).  As such, "[o]nce contrary evidence is introduced," that opinion "becomes just one piece of evidence," and the ALJ must consider various factors when deciding the weight to afford it, if any, including: the length, nature, and extent of the treatment relationship; frequency of examination; physician's specialty; types of tests performed; and consistency with and support for the opinion in the record.  *Ray v. Saul*, 861 Fed. Appx. 102, 105 (7th Cir. 2021); 20 C.F.R. § 404.1527(c).  The court upholds an ALJ's decision to discount a treating physician's opinion after considering

these factors if she "minimally articulated her reasons—a very deferential standard." *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008).

As in the First Lawsuit, Jacquelyen's primary complaint stems from the ALJ's discounting of treating VA psychiatrist Dr. Sunn's August 2011 statement that Jacquelyen was "so impaired that she cannot seek work and it is unlikely that she could concentrate long enough to complete tasks." (A.R. 3102-06.) Jacquelyen does not argue that this opinion is entitled to controlling weight though. She instead challenges the ALJ's reliance on the MEs' opinions to discount it.

Dr. Goldstein opined that Jacqueline had various lifting, sitting, standing, and walking limitations. Jacquelyen argues that the ALJ "improper[ly]" gave his opinion great weight, suggesting first that her MRI results objectively confirmed that she suffers from migraines and that Dr. Goldstein wrongly determined otherwise. (See R. 16, Pl.'s Mem. at 13 (noting that while Dr. Goldstein "acknowledged that an MRI had shown white matter changes," he "could not say it was an objective finding of migraines," and stating that "[o]ne wonders what would be an objective finding").) But MRIs are not used to diagnose migraines. Instead, "[d]octors use MRIs to *rule out other possible causes of headache.*" *Moon v. Colvin*, 763 F.3d 718, 722 (7th Cir. 2014) (emphasis in original). In fact, "there is no medical test . . . to confirm the presence or severity of migraine headaches." *Longerman v. Astrue*, No. 11 CV 383, 2011 WL 5190319, at *8-9 (N.D. Ill. Oct. 28, 2011). Moreover, both Dr. Goldstein and the ALJ acknowledged that Jacquelyen routinely reported migraine symptoms to providers who then recorded and treated the same. (See, e.g., A.R. 2934 (ALJ's

14

opinion noting that Jacquelyen "endorsed constant migraine pain accompanied by nausea and sensitivity to light and sound" and had "longitudinal and significant treatment . . . with Botox and other injections"); id. at 2966 (Dr. Goldstein's testimony that Jacquelyen "complained of frequent migraines").)  As such, the issue is not whether Jacquelyen experienced migraine symptoms, but whether her symptoms alone—or combined with her other impairments—were so severe that she was disabled during the relevant period.

Somewhat paradoxically, Jacquelyen also suggests that Dr. Goldstein (and the ALJ) improperly relied on the lack of imaging or laboratory results in refusing to impose additional restrictions.  (See R. 16, Pl.'s Mem. at 12-13 (arguing Dr. Goldstein was on a "quest" for objective evidence that "likely does not exist").)  Generally, "[t]he absence of 'medically accepted clinical and laboratory diagnostic techniques' is not 'evidence'" that a person does not suffer from severe migraines since "there are no such techniques that can detect" them.  *Stebbins v. Barnhart*, No. 03 CV 117, 2003 WL 23200371, at *3 (W.D. Wis. Oct. 21, 2003).  But while an ALJ may not rely solely on the lack of objective corroboration, the absence of corroboration is "still relevant." *Pierce v. Colvin*, 739 F.3d 1046, 1050 (7th Cir. 2014); *see also* 20 C.F.R. § 404.1527(C)(3) ("The more a medical source presents relevant evidence to support a medical opinion, particularly medical signs and laboratory findings, the more weight we will give that medical opinion.").  And here, the record was devoid of objective evidence supporting disabling effects from her migraines.

15

Indeed, Dr. Goldstein explained that Jacquelyen's physical examinations and MSEs were the "key tests" driving his analysis because of the lack of radiologic or laboratory tests, and that they largely reflected normal results. (A.R. 2969-73.) Dr. Goldstein also noted that there is no record of examination during a migraine so severe that it nearly caused Jacquelyen to pass out as he would expect if it occurred as she reported, (id. at 2968), and that even when she visited the emergency room, she was described as "constitutionally alert" and "in no acute distress," (id. at 2963 (citing id. 419, 564)).[7] As such, Dr. Goldstein's opinion was reinforced by more than a lack of objective imaging or laboratory test.

Jacquelyen also represents that Dr. Goldstein "falsely" testified that the relevant regulations "require him to find evidence of hospitalization for migraines in order for him to attest to extreme severity," and that he "acknowledged there was nothing in the record inconsistent with [Jacquelyen's] reports." (R. 16, Pl.'s Mem. at 13 (emphasis omitted).) But this court read Dr. Goldstein's testimony to mean that hospitalization was but one way to demonstrate debilitating migraines, and as explained, Dr. Goldstein noted the inconsistencies between Jacquelyen's statements

---

[7] The records from the same November 2012 emergency room visit also describe Jacquelyen as "alert and oriented" with normal affect, judgment, insight, and memory, and reporting "good pain relief," "refus[ing] a second dose of dilaudid," and "want[ing] to go home and rest." (A.R. 420, 565.) Records from other emergency room visits are similarly unremarkable. (See id. at 1701-12 (January 2010 visit in which Jacquelyen reported she had just started migraine medication regimen and was warned that "it will take a while to work," and was described as "uncomfortable" yet "[o]riented x3" with normal affect, judgment, and insight, and a normal neurological examination); id. at 1135-41 (November 2013 visit noting "negative" constitutional assessment, normal neurological exam, and reports that Jacquelyen was feeling "much better after meds" and rejected further medication).)

regarding her symptom severity and the records created while suffering them. (See A.R. 2968 (noting that there was no exam reflecting headache as severe as Jacquelyen alleged but inviting her attorney to "point it out" "if it's there"); see also id. at 2970 (indicating that examinations "were inconsistent with what [Jacquelyen is] saying, because I couldn't find anything that corroborated it").) As such the court finds that the ALJ did not err when weighing and relying on Dr. Goldstein's opinion.[8]

Jacquelyen lodges similar complaints about the weight afforded to Dr. Carney's opinion that she was only moderately limited in CPP and interacting with others, arguing there was "not a strong foundation" for an RFC "that allows for sufficient concentration and interaction" and suggesting that the only basis for that conclusion is Dr. Carney's belief that Jacquelyen was not "completely disabled." (R. 16, Pl.'s Mem. at 12.) The court agrees that Dr. Carney's use of this phrase was ill-advised. But he recommended several limitations to account for these shortcomings— including simple, routine work and limited contact with others—and sufficiently explained why they were enough, noting Jacquelyen's largely normal MSEs, (A.R. 2984), while still crediting some of her subjective reports, (id. at 2987, 2990, 2992 (noting that he "d[id]n't put a whole lot of weight" on Jacquelyen's "very subjective disclosures," but agreeing that Jacquelyen had "low energy" and "sleep problems" and was "preoccupied at times")).

---

[8] Jacquelyen also argues that Dr. Goldstein's logic was flawed in concluding that her migraines were not of listing-level severity. (See R. 16, Pl.'s Mem. at 12.) But she does not argue that the record supports otherwise, and it is her burden to show she meets all listing criteria to warrant reversal on this ground. *Maggard v. Apfel*, 167 F.3d 376, 380 (7th Cir. 1999).

Jacquelyen also complains that Dr. Carney was unaware of her lower GAF scores and the MCA with less-than-optimal results. (R. 16, Pl.'s Mem. at 12 (citing A.R. 2985-86).) Maybe not, but as discussed, the ALJ noted them and explained why she assigned them "little" weight—including because in each case the associated MSE was largely normal. (See, e.g., id. at 2928-29, 2940.) Further, Dr. Carney did not waver when confronted with them. He explained that GAF scores are not considered particularly useful and disagreed that Jacquelyen's MCA results were poor. (See, e.g., id. at 2984 (stating that "they don't do [GAF scores] in the DSM"); id. at 2988 (opining that Jacquelyen's MCA results were "still decent")); *see also Brinley*, 732 Fed. Appx. at 463 (noting that GAF was previously used in disability proceedings but is no longer recognized in the American Psychiatric Association's DSM). Jacquelyen may wish for the evidence to be weighed differently, but the ALJ was not required to do so and this court will not second-guess that choice. *See Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012) ("We do not reweigh the evidence or substitute our own judgment for . . . the ALJ['s].").

Jacquelyen next argues that Dr. Carney improperly relied on the fact that she occasionally took care of her son and traveled out of state—without acknowledging that one trip was for a funeral and others were supported by her doctors—to discount her subjective symptom allegations and to support his decision not to impose greater limitations. (R. 16, Pl.'s Mem. at 12.) But as discussed more fully later in this opinion, this was not an error. Simply put, the ALJ did not err in relying on the MEs' opinions, which supply substantial evidence to support her decision.

But Jacquelyen continues, arguing that the ALJ did not adequately explain why she assigned only "partial" weight to Dr. Sunn's opinion. (Id. at 13.) The court disagrees. The ALJ noted that at the time it was given, Dr. Sunn had been following Jacquelyen for just six months, did not conduct MSEs at all appointments, and "never documented observing" Jacquelyen exhibiting "marked deficits" on the MSEs she did conduct, which—whether completed by Dr. Sunn or another provider—"were largely within normal limits" and "devoid" of findings or deficits demonstrating that Jacquelyen was "too impaired to seek work or complete tasks," as Dr. Sunn opined. (A.R. 2927, 2938.)

Jacquelyen next criticizes the ALJ for again downplaying psychiatrist Dr. Zaror's characterization of her migraines as "paralyzing" despite the Seventh Circuit's admonition. (R. 16, Pl.'s Mem. at 14.) But the ALJ explained that: (1) Dr. Zaror has no training in assessing and treating migraines; (2) the characterization was based solely on subjective reports; and (3) the objective evidence proximate to it was "very inconsistent with it." (A.R. 2938-39 (noting corresponding MSE reflecting that Jacquelyen was "cooperative, polite, and alert" with "intact" insight and judgment, "good hygiene," and "logical" thoughts "as in the past").) Indeed, and as discussed earlier, even the emergency room visits the Seventh Circuit referenced were relatively unremarkable. As such, this court finds no error here.

Jacquelyen further argues in conclusory fashion that the ALJ rejected three other VA physician opinions for "the flimsiest of reasons." (R. 16, Pl.'s Mem. at 14.) But the ALJ's reasons were sufficient even assuming Jacquelyen had adequately

developed this argument. The ALJ acknowledged VA physician Dr. Brian Lipson's October 2013 opinion that Jacquelyen's conditions rendered her unable to secure and maintain substantially gainful employment but determined that it was inconsistent with the treatment records on which it was based.[9] (A.R. 2940.) And after noting VA psychologist Dr. Mark Aghakhan's opinion that Jacquelyen had moderate limitations in social and occupational interaction and adaptation and a GAF score of 51—an opinion the ALJ said was "supported overall" by the record—the ALJ nevertheless gave it limited weight because it was unclear whether Dr. Aghakhan had reviewed the "longitudinal treatment record." (Id.) Jacquelyen points out, however, that the ALJ also relied on the "observations of an ER physician who saw [her] once to undermine" Dr. Sunn's observations. (R. 16, Pl.'s Mem. at 15.) True enough. But that was only one piece of data the ALJ considered when explaining how she assessed Dr. Sunn's opinions. And even if the ALJ erred in weighing Dr. Aghakhan's opinion, Jacquelyen has not shown that doing so was harmful. *See Shinseki v. Sanders*, 556 U.S. 396, 409 (2009) ("[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination."). Nor could she because: (1) the ALJ agreed with Dr. Aghakhan that Jacquelyen is moderately limited in interaction with others, (see A.R. 2920); (2) the RFC includes limitations in adaptation, (see id. at 2922 (providing for "simple work instructions" in "routine work

---

[9]  Jacquelyen also argues that the ALJ "offered no support" for this assessment. (R. 16, Pl.'s Mem. at 14.) But she ignores that the ALJ referred back to her earlier discussion of Jacquelyen's treatment records, including the "primarily normal" physical and mental findings, (A.R. 2940), and that an ALJ's decision must be read as a whole, *Rice v. Barnhart*, 384 F.3d 363, 370 n.5 (7th Cir. 2004).

environment")); and (3) the GAF score referenced reflects only moderate limitations, *Felts*, 797 Fed. Appx. at 269 n.1. Finally, the ALJ recognized VA neurologist Dr. Robert Hazelrigg's opinion that Jacquelyen's migraines "affected her ability to work" but correctly determined that it was "too vague to be given any specific weight." (Id. at 2940.)

As for the VA's disability rating itself, Jacquelyen again contends that the ALJ "fail[ed] to accord [it] proper deference," pointing to the similarity in standards. (R. 16, Pl.'s Mem. at 14 (citing *Hall v. Colvin*, 778 F.3d 688, 691 (7th Cir. 2015)).) But nothing required the ALJ to adopt the rating as her own, and the ALJ adequately explained why she gave it "little" weight—that is, because the VA's conclusions rested largely on Jacquelyen's subjective reports and the examinations and other records do not substantiate them. (See A.R. 2939-40.) As the Seventh Circuit noted, unlike the Commissioner, the VA operates under a claimant-friendly standard. *See Jacquelyen D.*, 756 Fed. Appx. at 624 ("[T]he VA's evaluation of disability gives the benefit of the doubt to the claimant."). As such, there was no error here.

## B. Subjective Symptom Assessment

Jacquelyen argues that the ALJ "ignor[ed] . . . specific criticism[s]" by the Seventh Circuit and relied on "improper inferences" to make "untenable leaps of logic" in concluding that Jacquelyen was exaggerating her symptoms. (R. 16, Pl.'s Mem. at 15.) An ALJ's symptom evaluation is generally entitled to great deference because she can observe the claimant's credibility firsthand. *See Murphy v. Colvin*, 759 F.3d 811, 815 (7th Cir. 2014). As such, a court will not disturb it if it is based on specific

findings and evidence and not "patently wrong"—that is, so long as it does not "lack[]
any explanation or support." *Id.* at 815-16 (citing *Elder*, 529 F.3d at 413-14); *see also
Bates v. Colvin*, 736 F.3d 1093, 1098 (7th Cir. 2013) (stating that court's review of
ALJ's symptom assessment is "extremely deferential").

Jacquelyen first complains that the ALJ improperly discounted her symptom
allegations based on a lack of corroborating objective evidence. (R. 16, Pl.'s Mem. at
16-17.) A claimant's "testimony cannot be disregarded simply because it is not
corroborated by objective medical evidence." *Hill v. Colvin*, 807 F.3d 862, 869 (7th
Cir. 2015). That evidence (or lack thereof) is just a piece of the puzzle, *see* SSR 16-
3p, 2017 WL 5180304, at *7-8 (Oct. 25, 2017) and 20 C.F.R. §§ 404.1529, 416.929(c)(3)
(noting that in considering claimant's subjective symptoms, ALJ assesses the
objective medical evidence, daily activities, medication, treatment, or other methods
used to alleviate symptoms, and factors that precipitate and aggravate pain). But
Jacquelyen's testimony was not disregarded and the ALJ's logic was not so limited.

The ALJ's RFC largely tracked the assessments of the two independent MEs,
who like the ALJ, credited some of Jacquelyen's complaints but also noted her largely
normal physical examinations and MSEs. And although Jacquelyen argues that the
ALJ improperly emphasized "findings of good hygiene and eye contact" and other
"irrelevant and somewhat minor" observations from those MSEs, (R. 16, Pl.'s Mem.
at 15), mental health experts—not the ALJ—devised these criteria and found each
factor important. The ALJ cannot be faulted for considering them. Nor did the ALJ
rely solely on the observations Jacquelyen identifies. (See, e.g., A.R. 2920 (noting

that MSEs "do not mention . . . deficits in understanding, remembering or applying information"), 2925 (noting "normal speech" and "logical thought process" on May 2010 MSE), 2925-26 (noting "no impairment to memory" and that "both attention and calculation were normal" on April 2010 MSE), 2926 (noting Jacquelyen was "coherent, logical and cooperative" even during March 2011 MSE conducted when Dr. Sunn concluded that Jacquelyen was "so impaired that she cannot seek work and it is unlikely that she could concentrate long enough to complete tasks").) The ALJ did not err in considering the objective evidence, which as discussed reflects that even on what can only be assumed were her worst days, Jacquelyen was "in no acute distress." (Id. at 2963 (citing emergency room records).)

Jacquelyen also quarrels with the ALJ's observation that her condition may have improved, noting that improvement itself "holds little weight" because "the key is whether the individual has improved enough to be capable of sustaining full time employment." (R. 16, Pl.'s Mem. at 16.) In addition, Jacquelyen argues that the ALJ improperly questioned the veracity of Dr. Sunn's observation that her mental status was "essentially unchanged" between March 2010 when she began treating Jacquelyen and fall 2011 when she stopped doing so. (Id. at 17.) But the ALJ never found that Jacquelyen's condition rendered her incapable of full-time employment in the first instance. And the court reads the ALJ's decision as simply taking Dr. Sunn's comment at face value to indicate her belief that Jacquelyen's mental state was no better or worse than at prior exams—which did not reflect marked deficits. (A.R. 2927.) There was nothing improper here.

Jacquelyen next contends that the ALJ asserted without support that her symptoms were "not markedly disruptive" and her "lack of independence would not create barriers to work." (R. 16, Pl.'s Mem. at 16.) But that is not accurate either. The ALJ pointed out in detail Jacquelyen's largely normal examinations, indicating that while they reflect some difficulties—including the mild to moderate mental limitations and moderate physical limitations accounted for in Jacquelyen's RFC—they show that her symptoms are "less restrictive and disruptive than she claims." (A.R. 2934.) To be sure, and as the ALJ noted, about five months passed before Jacquelyen refilled her migraine prescription Imitrex, (id. at 2930), and at another her therapist noted that she had not seen her psychiatrist in as much time, (id. at 2932). Moreover, as the ALJ also recognized, there was evidence her medications were effective. (See, e.g., id. at 2928 (noting that Jacquelyen reported "good relief" after Dilaudid injection at the emergency room and in fact "refused a second injection").) In sum, the ALJ did find that Jacquelyen's symptoms created barriers to work but did not bar all work.

Jacquelyen also argues that the ALJ improperly considered her daily living activities—including her travels to Florida—in asserting that "occasional and limited activities" do not "translate into an ability to sustain full time work." (R. 16, Pl.'s Mem. at 16-17 (citing *Bjornson v. Astrue*, 671 F.3d 640 (7th Cir. 2012)).) Generally, daily living activities must be considered "with care," *Roddy v. Astrue*, 705 F.3d 631, 639 (7th Cir. 2013), because a claimant's "ability to struggle through" them "does not mean that she can manage the requirements of a modern workplace," *Punzio v.*

24

*Astrue*, 630 F.3d 704, 712 (7th Cir. 2011). The ALJ did so here. She noted Jacquelyen's activities and certain inconsistencies between statements Jacquelyen made about them during hearings, and those her providers recorded. (See, e.g., A.R. 2924 (noting that Jacquelyen disputed multiple reports that she served as caregiver to her 80-year-old mother while in Florida); id. at 2924-25 (pointing to Jacquelyen's testimony that she could not concentrate on college-level coursework, but noting that she obtained an associate's degree during the relevant period); id. at 2924-26, 2931 (noting Jacquelyen's testimony that she had never gone walking or biking and had not worked out regularly prior to 2015, but that the record reflected she had joined a health club and was walking at the mall); id. at 2925 (noting that Jacquelyen's ability to attend appointments and travel to Florida, San Diego, and Missouri showed that she was "able to go out, although she reported she isolated").) It was not wrong for these inconsistencies to factor into the ALJ's credibility assessment. *See Bates*, 736 F.3d at 1098 (noting that "[e]ven . . . a minor discrepancy, coupled with the hearing officer's observations of the claimant during the hearing, is sufficient to support an ALJ's finding that a claimant was incredible"). Even if the ALJ put too much emphasis on Jacquelyen's activities, there was no error because, as explained, other valid reasons supported her logic. *See Halsell v. Astrue*, 357 Fed. Appx. 717, 722 (7th Cir. 2009) (affirming symptom assessment despite flawed daily living activities analysis because "[n]ot all of the ALJ's reasons [for disbelieving a claimant] must be valid as long as *enough* of them are") (emphasis in original)). In short, "[t]he ALJ's credibility assessment need not be perfect; it just

can't be patently wrong." *Dawson v. Colvin*, No. 11 CV 6671, 2014 WL 1392974, at
*10 (N.D. Ill. April 14, 2014) (citing *Schreiber v. Colvin*, 519 Fed. Appx. 951, 961 (7th
Cir. 2013)).

**C.   Mental RFC Assessment**

Jacquelyen challenges the ALJ's mental RFC assessment, arguing that the
ALJ ignored the Seventh Circuit's "objections to the mental RFC assessment,"
making "no changes" other than to add an "unsupported statement that [she] would
be able to sustain the requisite concentration and attention in two-hour increments."
(R. 16, Pl.'s Mem. at 18.)   When assessing the RFC, the ALJ must "evaluate all
limitations that arise from medically determinable impairments, even those that are
not severe, and may not dismiss a line of evidence contrary to the ruling." *Villano v.
Astrue*, 556 F.3d 558, 563 (7th Cir. 2009).   Jacquelyen is correct about the minimal
changes the ALJ made to the RFC but is wrong that more was required.   As the ALJ
explained, while she described Jacquelyen's mental disorders as "severe" and credited
many of her subjective reports regarding her mental functioning (including as
reported to her care providers), she concluded that the objective evidence simply did
not support the severity of symptoms she alleged.   There was no error in declining to
impose greater limitations, despite Jacquelyen's conclusory arguments to the
contrary.   (See R. 16, Pl.'s Mem. at 20 (arguing that it was "inconceivable" that
Jacquelyen could sustain full-time work).)

Jacquelyen also suggests that the only aspect of the RFC meant to account for
the moderate CPP deficiencies the ALJ noted was the limitation to simple, repetitive

work, which is not enough. (See id. at 18 ("It has long been recognized that limiting an individual . . . to simple, repetitive work does not necessarily address moderate deficiencies of [CPP]."").) But both the ALJ and Jacquelyen recognized that Jacquelyen's concentration issues (and migraines) arose in stressful situations. (See, e.g., A.R. 2926 (noting VA diagnoses of migraines and memory impairment "secondary to acute stress reaction"); id. at 2939 (noting that MSEs were largely normal "except for depressed or anxious mood related to stress"); see also id. at 2925 (noting Jacquelyen's reports that her migraines were "definitely related to" stress).) Accordingly, the ALJ's RFC restricts Jacquelyen to routine work, a moderate or quieter noise level, no team or tandem work, no work with the public, and only occasional interaction with co-workers, and acknowledges that only with these limitations could Jacquelyen sustain her work tasks for the two-hour increments that are typical. (Id. at 2922.) This is more than adequate. *See Bruno v. Saul*, 817 Fed. Appx. 238, 241-42 (7th Cir. 2020) (affirming RFC that restricted claimant with moderate CPP limitations to "simple routine tasks," "simple work related decisions," and "brief and superficial interaction" with co-workers where claimant's concentration struggles were limited to complex tasks); *see also Pavlicek v. Saul*, 994 F.3d 777, 783 (7th Cir. 2021) (affirming RFC assessment restricting individual with moderate CPP limitations to "simple, repetitive tasks at a consistent pace").[10]

---

[10]  Jacquelyen also complains that the ALJ did not limit supervisor contact, noting her history of harassment. (R. 16, Pl.'s Mem. at 20.) However, the ALJ plainly lumped "supervisors" and "peers" together as coworkers in the limitations she assessed regarding interaction. (See A.R. 2936 (noting in limiting Jacquelyen to no team or tandem work and only occasional interaction with coworkers that she had

**Conclusion**

For the foregoing reasons, Jacquelyen's motion for summary judgment is denied and the government's is granted.

ENTER:

_____

**Young B. Kim**
**United States Magistrate Judge**

---

been "traumatized" by coworkers and so was moderately limited in her "ability to accept instructions and respond appropriately to criticism from supervisors").) Moreover, Jacquelyen failed to show that the unskilled jobs the ALJ found she could perform would require more than a tolerable amount of supervisor oversight. (See generally R. 16, Pl.'s Mem. at 20); *see also Jozefyk v. Berryhill*, 923 F.3d 492, 498 (7th Cir. 2019) (noting it was "unclear what [additional] kinds of work restrictions might address [the claimant's mental functioning] limitations . . . because [she] hypothesizes none").